**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JENNIFER IRENE SPAN, | ) | CASE NO. 1:23-CV-2362 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION** |
| SECURITY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

## I.    INTRODUCTION

The Commissioner of Social Security denied Plaintiff Jennifer Irene Span's application for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB).[1] Ms. Span seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). (Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (ECF No. 5.)

For the reasons set forth below, the Court VACATES the Commissioner's final decision denying Ms. Span's application for benefits and REMANDS this matter for further proceedings consistent with this opinion.

## II.    PROCEDURAL HISTORY

In December 2017, Ms. Span applied to the Social Security Administration (SSA) seeking DIB benefits; she claimed that she became disabled on May 5, 2013. (Tr. 257.)[2] She subsequently

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023.

[2] The administrative transcript appears at ECF No. 6. The Court will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 257"). The

amended her application to allege an onset date of June 1, 2014. (Tr. 972.) She listed ten disabling conditions: chronic body pain from back to legs, aching joints, fibromyalgia, lupus, arthritis, rheumatoid arthritis, bipolar disorder, attention-deficit/hyperactivity disorder, depression, and anxiety. (Tr. 291.)

The SSA denied Ms. Span's claim on May 31, 2018, finding that she had some work-related limitations but retained the ability to stand, walk, and lift objects that are not heavy. (Tr. 149.) The SSA further determined that Ms. Span was able to think clearly, act in her own interest, and communicate with others. (*Id.*) The SSA found that Ms. Span could perform work "which does not require heavy lifting, frequent changes, strict production demands, or more than superficial interaction with others." (*Id.*)

Ms. Span requested reconsideration of that decision. (Tr. 156.) In September 2018, the SSA informed Ms. Span that it had reconsidered her opinion and come to the same conclusion—that she is not disabled. (Tr. 157.)

Ms. Span then requested a hearing with an administrative law judge. (Tr. 164.) The ALJ held a hearing on November 15, 2019. (Tr. 40–75.) The ALJ denied Ms. Span's application on January 28, 2020. (Tr. 739.)

On September 28, 2020, the SSA Appeals Council denied Ms. Span's request to review the ALJ's decision. (Tr. 1.) Ms. Span sought judicial review of that decision.

On June 15, 2021, while that lawsuit was pending, Ms. Span filed another application, for Title II and Title XVI benefits. The applications were consolidated with her pending matter. (Tr. 690–716, 723–38, 806.)

---

Court will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 1945").

2

In September 2021, state consultants found that Ms. Span was not disabled at the initial level, and Ms. Span requested reconsideration. (Tr. 771, 857.)

On October 26, 2021, Ms. Span and the SSA jointly stipulated that the original-application matter should be remanded for further proceedings. (Tr. 786.) The Court remanded the matter back to the agency on the same day. (Tr. 785.)

State consultants affirmed the initial finding on the June 2021 applications at the reconsideration level. (Tr. 789.) On February 4, 2022, the SSA denied Ms. Span's application. (Tr. 851, 856, 860, 916.)

On March 18, 2022, Ms. Span requested a hearing with an ALJ. (Tr. 869.)

On May 7, 2022, the SSA appeals council—based on the federal-court remand—remanded the original matter back to the ALJ and ordered the matter consolidated with Ms. Span's new applications. (Tr. 802.) It instructed the ALJ to give further consideration to the medical opinion of Dr. Ignat and to discuss supportability and consistency separately in assessing the opinion's persuasiveness. (Tr. 804.) The Council further instructed the ALJ to consider supportability and consistency in assessing the persuasiveness of the prior administrative medical findings. (Tr. 805.)

The ALJ held a second hearing on August 15, 2023. (Tr. 1847–90.)[3] The ALJ issued a decision on September 20, 2023, finding that Ms. Span was not disabled. (Tr. 687.)

Ms. Span filed her complaint seeking judicial review of that decision on December 12, 2023. (Compl., ECF No. 1.) She raises the following assignments of error:

> First Assignment of Error: The ALJ erred at Step Two . . . when she failed to properly apply the criteria of Social Security Ruling 96-8p and consider Plaintiff's fibromyalgia and related limitations when forming the RFC.

---

[3] The ALJ opened a hearing on March 7, 2023, but the hearing was promptly postponed to allow additional time to consolidate the various application files. (Tr. 725–38.)

3

> Second Assignment of Error: The ALJ erroneously failed to comply with the Order of Remand when she improperly assessed the opinion of the treating rheumatologist.
>
> Third Assignment of Error: The ALJ erred when she failed to properly apply the doctrine of *res judicata* when she adopted the findings of the earlier decision that she made in 2016.
>
> Fourth Assignment of Error: At Steps Four and Five . . ., the ALJ's RFC finding that Plaintiff could perform her past relevant work or other jobs at the light level of exertion was not supported by sufficient evidence.

(Pl.'s Merits Br., ECF No. 7, PageID# 1918.)

## III. FACTUAL BACKGROUND

### A. <u>Ms. Span's Previous Application for Benefits</u>

Ms. Span applied for DIB on October 1, 2014, alleging a disability onset date of May 5, 2013. (Tr. 79.) Ms. Span claimed the following disabling conditions: chronic body pain from back to legs, aching joints, fibromyalgia, lupus, arthritis, rheumatoid arthritis, bipolar disorder, attention deficit hyperactivity disorder, depression, and anxiety. (Tr. 105.) The SSA denied her claim at the initial (Tr. 121, 123) and reconsideration (Tr. 142–43) levels, and an ALJ issued a decision on August 25, 2016, finding that Ms. Span was not disabled. (Tr. 79.) Specifically, the ALJ found that Ms. Span had severe impairments of degenerative disc disease and inflammatory arthritis, as well as a non-severe mental impairment of "affective disorders." (Tr. 81–82.) But the ALJ found that no impairment or combination of impairments equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 84.) The ALJ determined that Ms. Span has the residual functional capacity to:

> [P]erform light work . . . except: She can occasionally lift and carry twenty pounds and frequently lift and carry ten pounds. She can push and pull within the lifting and carrying limitations. She can stand or walk for six hours of an eight-hour workday. She can sit for six hours of an eight-hour workday. She can frequently reach overhead with her right upper extremity.

> She can frequently perform handling and fingering with the bilateral upper extremities.

(Tr. 84.)

Based on this RFC, the ALJ determined that Ms. Span could perform her past relevant work as a mortician, receptionist, or pharmacy technician. (Tr. 89.) Moreover, the ALJ determined that Ms. Span could also perform other work, including the work required of a "counter clerk," "children's attendant," or "food service worker." (Tr. 91.)

Ms. Span asked the SSA Appeals Council to review the ALJ's determination; in connection with that request, Ms. Span submitted medical records dated between September 20 and November 7, 2016. (Tr. 98.) In August 2017, the SSA Appeals Council declined to review the ALJ's determination. (Tr. 97.) The Council reasoned that the additional medical records Ms. Span submitted were obtained after the ALJ issued its decision, and therefore were not relevant to the Council's review of that decision. (*See* Tr. 98.)

### B.    The Current Application for Benefits

#### 1.    Personal, Educational, and Vocational Experience

Ms. Span was born in March 1977 and was 40 years old on the date of her application. (Tr. 257.) She has a bachelor's degree and held a license to serve as a funeral director. (Tr. 45.) She lives with her brother. (Tr. 1855.) While she previously worked as a funeral director and as a receptionist at a car dealership, she has not worked in any meaningful capacity since at least August 2016. (Tr. 46–47, 1856–58, 1868.)

#### 2.    Relevant Hearing Testimony

##### a.    *Ms. Span's Testimony*

The ALJ asked Ms. Span what problems were keeping her from working full-time. She responded as follows:

> My joints have just gotten worse. My back has gotten worse. . . . [I]f I'm writing out bills, I can't even write the whole group of them out, at one time. I have to put the pen down and literally just stop. My hands completely freeze up. I mean, I can't do my fingernails. I can't curl my hair any longer. I can't carry a heavy purse any longer. I can't stand for long periods of time. I can't sit for long periods of time. I can't do anything that I used to do.

(Tr. 52–53.)

Ms. Span testified that she broke her back when she was 18 years old and has been in pain since then. (Tr. 53–54.) The pain is getting worse, and her joints and legs are now hurting as well. (*Id.*) Ms. Span described that she wears a back brace, takes pills daily, and receives injections to help alleviate the pain. (Tr. 54.)[4] The joints that hurt her are her hips, knees, shoulders, and ankles. (Tr. 56.) Her back and hands also hurt. (*Id.*)

Ms. Span stated that she cannot be in any one position for more than about 15 minutes. (Tr. 63.) She can no longer pick up her dog, even though the dog weighs less than twenty pounds. (Tr. 64–65.)

Ms. Span is able to cook simple meals for herself and her father. (Tr. 57.) She is also able to do her own laundry. (*Id.*) She finds herself fatigued every day; she normally takes a two-hour nap each day. (Tr. 64.)

Ms. Span described that her depression has gotten "worse than it ever used to be." (Tr. 66.) She cries a lot. (Tr. 67.) She does not like to be out of the house anymore and she feels constantly anxious and nervous. (Tr. 67–68.)

At the second hearing, Ms. Span testified that she tried to work in 2021 but found that she "only lasted like a week and a half, two weeks." (Tr. 1857.)

---

[4] Ms. Span also wrote that a doctor suggested that she use a cane. (Tr. 1037.)

### b. *Vocational Experts*

Vocational expert Dr. Eric Dennison testified at the hearing in response to a hypothetical question posed by the ALJ. The ALJ asked Dr. Dennison whether a hypothetical person who is (1) able to perform the full range of light work, but not at a production-rate pace, and (2) able to interact frequently with supervisors, coworkers, and the public, but could only be exposed to routine workplace changes, would be able to perform Ms. Span's previous positions. (Tr. 69–70.)

Dr. Dennison testified that the hypothetical person could not perform the work of a funeral director as actually performed by Ms. Span. (Tr. 70.) But he testified that the hypothetical person could perform Ms. Span's previous position as a receptionist and could perform the work of a funeral director as generally performed, at the light exertional level. (*Id.*) Dr. Dennison testified that Ms. Span could also perform the work of an "office helper," "marker," or "mail clerk." (Tr. 71.)

In response to questions posed by Ms. Span's counsel, Dr. Dennison confirmed that a hypothetical person who could stand or walk no more than two hours could not perform any of those jobs. (Tr. 71–72.) Similarly, if a person was off task for 15 percent of the day, the person could not perform those jobs. (Tr. 72.) A hypothetical person who could not interact with others for more than 15 percent of the workday would not be able to perform all of the jobs identified. (*Id.*) And a person who would miss four days of work per month could not sustain employment in any of those jobs. (Tr. 72–73.) Finally, Dr. Dennison confirmed that a hypothetical person who is unable to perform frequent handling, bilaterally, would not be suitable for any of the jobs he identified. (Tr. 73.)

At the second hearing, vocational expert Laura Kuzoro classified Ms. Span's past work as a receptionist, which Ms. Kuzoro described as a semi-skilled sedentary job with a specific

vocational preparation (SVP) rating of four. (Tr. 1869–70.) Ms. Kuzoro classified Ms. Span's previous funereal work as a composite job comprising that of a funeral director (skilled light work with an SVP of seven, although Ms. Span performed it at a medium level of exertion), a cremator (semi-skilled heavy work with an SVP of three, although Ms. Span performed it at a very heavy level of exertion), and an embalmer (skilled heavy work with an SVP of seven, although Ms. Span performed it at a very heavy level of exertion). (Tr. 1870–71.)

The ALJ asked Ms. Kuzoro to assume that a hypothetical individual could perform light work but could not work at a production-rate pace. (Tr. 1883.) The ALJ further asked Ms. Kuzoro to assume that the individual could only handle superficial interactions with others. (*Id.*) Ms. Kuzoro confirmed that the hypothetical person could not perform Ms. Span's past funereal work but could perform receptionist work. (Tr. 1883–84) Ms. Kuzoro testified that the hypothetical person could also perform other jobs that exist in substantial numbers in the national economy, those being "cleaner," "marker," and "cleaner and polisher." (*Id.*)

Under examination by Ms. Span's counsel, Ms. Kuzoro testified that all work would be ruled out if the hypothetical person needed to elevate their legs to hip-level during the workday, if they could only sit and stand for two hours each during the workday, if the individual was off task 25 percent or more of the day, or if the individual missed four or more days of work per month. (Tr. 1887–88.)

### 3. State Agency Medical Consultants

#### a. *Initial Level*

A disability examiner (Pauline Hollingsworth), a physician (Steve McKee, M.D.), and a psychologist (Courtney Zeune, Psy.D.) reviewed Ms. Span's claim at the initial administrative level. Based on their review, the agency determined that the medical evidence showed "a long

history of pain symptoms" but concluded that Ms. Span's claim "that she is unable to stand, walk, sit or write for long periods of time due to her conditions" was only partially consistent with the record. (Tr. 778.) The agency concluded that "physical exams show that her strength and ability to walk/stand/sit without assistance remains intact." (*Id.*)

Dr. McKee opined that Ms. Span can frequently perform fine and gross manipulation tasks with both hands and can, with normal breaks, sit for about six hours in a workday and stand or walk for six hours. (Tr. 780–81.)

Dr. Zeune opined that Ms. Span can interact frequently with supervisors, coworkers, and the general public but should avoid performing tasks that require strict production rates. (Tr. 782.)

Based on these conclusions, the agency determined that Ms. Span was not disabled because she had the residual functional capacity to perform light work such as that required of a "car-wash attendant" or "order caller." (Tr. 783.)

### b. *Reconsideration Level*

At the reconsideration level, a disability examiner (Shirley Bah), a physician (Leon Hughes, M.D.), and a psychologist (Kristin Haskins, Psy.D.) affirmed the finding that Ms. Span is not disabled.

Drs. Hughes and Haskins opined that the medical records showed that Ms. Span's physical and mental conditions were adequately "being managed" with treatment, such that no changes needed to be made to the initial residual functional capacity. (Tr. 798, 800.)

Based on these conclusions, the agency determined that Ms. Span was not disabled because she had the capacity to perform light work such as that required of a "buckle-wire inserter," "assembler," or "hot stone setter." (Tr. 800.)

### 4. **Relevant Medical Evidence**

#### a. *Physical Health*

Ms. Span consulted with her primary-care physician, Dr. John Kavlich, in 2014. (Tr. 1108–14.) Dr. Kavlich's handwritten notes from these appointments are difficult to read due to penmanship. (*See id.*) But the notes reflect that Ms. Span complained of pain and weakness in her arms and shoulder and underwent magnetic-resonance imaging. (*See* Tr. 1109 ("arm not any better," "schedule her with a neurologist"), 1110 ("she 'can't get comfortable in my own skin'"), 1111 ("MRI of spine is negative," "[Patient] says her [right] side hurts so much . . . says she can't write anymore and the pain keeps her up at night"), 1112 ("loss strength entire [left] upper extrem[ity]"), 1113 ("[right] shoulder and arm are not bending or able to move right. . . . [right] hand is constantly swollen and middle finger top knuckle . . . is tender to touch").)

Ms. Span was evaluated by Dr. Khalid Darr on January 22, 2015, for purposes of a medical evaluation in connection with her previous disability claim. (Tr. 1130.) Dr. Darr noted that Ms. Span's low back pain was probably caused by degenerative disc disease and opined that the complained pain in her left arm was of "etiology unknown." (Tr. 1133.) But he assessed that she had completely normal range of motion in all respects (Tr. 1134–37) and had no significant limitations to her ability to sit, stand, carry, lift, push, pull, or manipulate objects (Tr. 1133).

Ms. Span consulted with rheumatologist Dr. Gheorghe Ignat, M.D., on January 13, 2016. (Tr. 1139.) Dr. Ignat's notes reflect that Ms. Span complained of "generalized aches and pains all over" "more hands pain," "variable fatigue," and lower back pain that was less than before but which increased "with certain activity, bending, lifting and prolonged sitting." (*Id.*)

Dr. Ignat's physical examination revealed variable synovitis at multiple proximal interphalangeal (PIP) and metacarpophalangeal (MCP) joints, as well at "medium and large

joints." (*Id.*) Dr. Ignat noted mild synovitis, swelling, and tenderness over Ms. Span's posterior right elbow ("more than the left"), left-side sternoclavicular (SC) joint, acromioclavicular (AC) joints on both sides, the left ankle, the left tarsal joint, and three metatarsophalangeal (MTP) joints on the left side. (*Id.*) There was "moderate tenderness" over the lower thoracolumbar area. (*Id.*) While Dr. Ignat noted mild kyphosis of the thoracic spine and mild scoliosis in the upper thoracic spine, he assessed that there was no sign of radiculopathy or focal neurologic deficit. (*Id.*) He assessed that Ms. Span had "modest" Heberden's nodes at the distal interphalangeal (DIP) joints of the index and middle fingers, with "minimal tenderness and pain." (*Id.*) There was mild tenderness but no gross synovitis at the first carpometacarpal joints of the right thumb, which he opined was "suggestive of [degenerative joint disease]." (*Id.*) Ms. Span had normal strength in her shoulder and hip girdle muscles, normal flexor muscles or the neck, and normal grips. (*Id.*)

Dr. Ignat's impression was that Ms. Span had intermittent inflammatory polyarthritis or potentially systemic lupus erythematosus or a mixed connective-tissue disease, osteoarthritis, possibly psoriatic arthritis, a history of subacromial bursitis that was symptomatic "on and off," a herniated disc with spinal stenosis causing pseudoclaudication, and a history of lumbar spondylosis with radiculopathy. (Tr. 1139.)

Dr. Ignat continued Ms. Span on medication for these conditions and counseled her to engage in stretching and isometric and range-of-motion exercises. (*Id.*)

When Ms. Span consulted with Dr. Ignat again on April 13, 2016, her condition and the treatment plan were unchanged. (*See* Tr. 1138.) Dr. Ignat ordered rheumatological blood tests (AVISE and Vectra). (*Id.*) Both tests came back normal. (Tr. 362.)

Ms. Span next met with Dr. Ignat on August 2, 2016. (Tr. 362.) At that time, she complained primarily of hand pain, and because there was less swelling in the MCP joints the

11

treatment plan remained unchanged, except that Dr. Ignat started Ms. Span on topiramate (Topamax). (*See id.*)

Ms. Span consulted with Dr. Ignat on November 1, 2016. (Tr. 361.) Dr. Ignat noted that Ms. Span had numbness in both hands and pain in both hands, arms, and legs that was "in general not controlled." (*Id.*) Dr. Ignat continued Ms. Span on her medications and ordered nerve-conduction-velocity tests on her upper extremities. (*Id.*) The tests came back normal. (Tr. 360.)

Ms. Span consulted with Dr. Ignat on November 22, 2016. (Tr. 360.) Ms. Span's condition and treatment plan remained unchanged. (*See id.*)

Ms. Span consulted with Dr. Ignat on February 21, 2017. (Tr. 359.) Ms. Span's condition and treatment plan were unchanged, but Dr. Ignat gave Ms. Span injections of lidocaine and triamcinolone (Kenalog) in the greater trochanteric bursa. (*See id.*)

Dr. Ignat gave Ms. Span injections on June 7, 2017. (Tr. 379, 676.) Ms. Span's condition was unchanged. (*Id.*) Dr. Ignat noted that a prescription for pregabalin (Lyrica) had not been approved. (*Id.*)

Ms. Span presented to a hospital emergency department on July 15, 2017, after suffering a fall. (Tr. 1395.) Ms. Span complained of pain in her left hand; the emergency-room physician noted marked swelling and limited range of motion in the left hand. (Tr. 1396.)

Ms. Span consulted with Dr. Ignat on September 12, 2017, for hip injections. (Tr. 375, 377.) Ms. Span's condition was unchanged. (*Id.*)

Dr. Kavlich completed a medical source statement on October 12, 2017. (Tr. 366–69.) Dr. Kavlich noted that he had treated Ms. Span for eight years. (Tr. 366.) He identified the following diagnoses: chronic pain, fibromyalgia, lupus, and rheumatoid arthritis. (*Id.*) His prognosis included that Ms. Span would have progressive weakening in her hands, with intense joint discomfort and

12

chronic pain. (*Id.*) He also identified that Ms. Span had significant physical limitations, including that she could only sit for five minutes at a time before needing to walk around and that she could not lift or carry anything weighing ten pounds or more. (Tr. 367–68.) He opined that Ms. Span would be off task 25 percent of a typical workday, or more, and would be absent from work more than four days per month. (Tr. 369.)

Ms. Span consulted with Dr. Ignat on December 12, 2017. (Tr. 372.) Her condition was unchanged. (*Id.*) Dr. Ignat gave Ms. Span injections in her back. (*Id.*)

Ms. Span consulted with Dr. Ignat on March 13, 2018, for hip and back injections. (Tr. 544.) Her condition was unchanged. (*Id.*)

On April 18, 2018, Ms. Span was evaluated by Dr. Jeff Kirschman for purposes of her disability application. (Tr. 383.) Dr. Kirschman affirmed that Ms. Span has lupus "with arthritic presentation," chronic low back pain, and mental-health concerns. (Tr. 386.) He noted that Ms. Span has marked limitations with lifting and carrying, walking, climbing, stooping, bending, kneeling, and crouching. (Tr. 387.) He noted that she has moderate limitations with standing and using her feet. (*Id.*) And he noted that she has mild limitations with sitting, reaching, and fine motor skills. (*Id.*) He noted normal results in muscle testing and some limitations with respect to range-of-motion in the shoulders, finger joints, knees, and spine. (Tr. 388–91.) He assessed that Ms. Span's prognosis was "guarded." (Tr. 386.)

Ms. Span consulted with Dr. Ignat on June 5, 2018, complaining of bilateral hip and back pain. (Tr. 540.) Her condition was unchanged, and she received hip injections. (*Id.*)

Ms. Span consulted with Dr. Ignat on June 28, 2018, complaining of pain in her fingertips and legs. (Tr. 536.) Dr. Ignat noted that Ms. Span was having difficulty walking due to pain and intermittent swelling in her knees. (Tr. 537.) Dr. Ignat gave Ms. Span injections in her knees. (*Id.*)

Ms. Span consulted with Dr. Ignat on September 27, 2018 and December 28, 2018, for prescription refills and injections. (Tr. 528, 532.) Ms. Span's condition was unchanged. (*Id.*)

Ms. Span consulted with Dr. Ignat on February 15, 2019, for injections. (Tr. 524.)

Ms. Span consulted with Dr. Aman Ramella, a new primary-care physician, on March 5, 2019. (Tr. 564.) Dr. Ramella included fibromyalgia on his list of assessed medical conditions. (*Id.*) Dr. Ramella assessed that Ms. Span had normal range of motion and normal strength and muscle tone. (*Id.*) Dr. Ramella wrote that Ms. Span's low back pain was constant, worse with movement or if sitting or standing for long periods of time. (*Id.*)

Ms. Span consulted with Dr. Ignat on May 16, 2019, for injections. (Tr. 596.) Dr. Ignat's assessment of Ms. Span's musculoskeletal system remained unchanged from previous appointments. (Tr. 597–98 (describing mild synovitis, tenderness, etc.).)

Ms. Span saw Dr. Ignat again on May 16, 2019, for injections. (Tr. 642.) Dr. Ignat completed a medical source statement for her the same day. (Tr. 468–71.) Dr. Ignat opined that Ms. Span can sit for one hour at a time and stand for 20 minutes. (Tr. 469.) Dr. Ignat opined that Ms. Span could sit for at least six hours of an eight-hour workday and stand/walk for less than two hours. (*Id.*) He opined that Ms. Span would have to walk for ten minutes every hour and would likely take two twenty-minute breaks during the workday. (*Id.*) He believed that Ms. Span would be off task for 15 percent of the workday and would be absent approximately four days per month. (Tr. 470–71.) He noted limitations with lifting and using the hands/fingers/arms during the workday. (Tr. 470.)

Ms. Span consulted with Dr. Ramella on July 9, 2019. (Tr. 612.) Fibromyalgia was not included on the list of assessments, although the purpose of this appointment was primarily for cholesterol bloodwork and prescription refills. (*See id.*)

14

Ms. Span consulted with Dr. Ignat on August 15, 2019, for prescription refills and injections. (Tr. 638.) Dr. Ignat noted that the pain in Ms. Span's hands, arms, and legs was "in general partially controlled." (*Id.*) She also had lower back pain and hip pain that was radiating into her legs. (*Id.*) Dr. Ignat gave her injections. (*Id.*)

Ms. Span consulted with Dr. Ramella on October 8, 2019. (Tr. 683.) Dr. Ramella noted that Ms. Span complained of moderate fatigue, joint stiffness, painful joints. (Tr. 684.) Dr. Ramella noted that Ms. Span was compliant with her treatment for osteoarthritis, which treatment was controlling the joint pain. (*Id.*) Dr. Ramella noted that his examination showed that Ms. Span had normal range of motion, strength, and muscle tone. (Tr. 685.)

Ms. Span consulted with Dr. Ignat on November 14, 2019, for injections into gluteal trigger points. (Tr. 679–80.) Ms. Span was complaining of severe back pain and Dr. Ignat noted that the gluteal trigger points were "very tender." (Tr. 681.)

Ms. Span consulted with Dr. Ignat on February 13 and May 14, 2020, for prescription refills and injections. (Tr. 1249, 1253.) Ms. Span's condition was unchanged, but Dr. Ignat noted that Ms. Span's pain had grown worse since she "had to stop Lyrica, because of lack of coverage." (*Id.*)

Ms. Span consulted with Dr. Ignat on August 13, 2020, for prescription refills and injections. (Tr. 1177–78.) Dr. Ignat noted that Ms. Span was experiencing pain in her right shoulder, right hip, and right para spinal lumbar region. (Tr. 1178.) He also noted that she was feeling more depressed because her father passed away. (Tr. 1178–79.)

Ms. Span consulted with Dr. Ramella on August 18, 2020. (Tr. 1181.) Ms. Span had no new complaints, although Dr. Ramella also noticed the depressed mood. (*See id.*)

Ms. Span consulted with Dr. Ignat on November 17, 2020, for injections. (Tr. 1185.) Ms. Span's condition was unchanged; she had shoulder and hip pain in particular at the appointment. (Tr. 1186.)

Ms. Span consulted with Dr. Ramella on November 24, 2020. (Tr. 1189.) Dr. Ramella noted that he was treating Ms. Span for fibromyalgia. (*Id.*) Specifically, he prescribed her pregabalin (Lyrica) to treat the condition. (Tr. 1190.)

Ms. Span consulted with Dr. Ramella on February 24, 2021. (Tr. 1193.) Dr. Ramella noted that Ms. Span was complaining of hand tremors and "9/10 lumbar back pain." (Tr. 1194.) Ms. Span described intermittent hand tremors that occurred with certain activity "such as painting her nails." (Tr. 1194.) Dr. Ramella wrote that recently, Ms. Span's lower back pain "has increased and she is having trouble standing or sitting for long periods of time." (*Id.*)

Ms. Span consulted with Dr. Ignat on March 9, 2021, for injections. (Tr. 1197.) Ms. Span's condition was not materially changed; her pain was still "in general partially controlled," but she complained of hip pain at the appointment. (Tr. 1198.)

Ms. Span consulted with Dr. Ignat on June 10, 2021, for injections. (Tr. 1233.) Dr. Ignat noted that Ms. Span was complaining of "a lot of pain in hips at night," as well as general back and joint pain. (*Id.*)

Ms. Span consulted with Dr. Ramella on August 25, 2021. (Tr. 1364.) The appointment notes identify fibromyalgia as an assessed condition and note that it is "stable, following with rheumatology and is also on chronic pain management." (*Id.*)

Ms. Span consulted with Dr. Ignat on November 5, 2021, for injections. (Tr. 1341.) Ms. Span's condition was unchanged, with Dr. Ignat noting that she was trying to be active and lose weight through a new diet. (Tr. 1342.)

Ms. Span consulted with Dr. Ramella on November 24, 2021, for medication refills and bloodwork. (Tr. 1345.) Ms. Span had no new complaints. (*Id.*)

Ms. Span consulted with Dr. Sanjit Bindra throughout 2022 for a hypothyroidism consultation. (Tr. 1378, 1520, 1523.) Dr. Bindra's notes identify fibromyalgia among the list of Ms. Span's medical problems. (*Id.*) Ms. Span missed appointments with Dr. Bindra on March 28 and April 4, 2023. (Tr. 1839, 1841.)

Ms. Span consulted with Dr. Ignat on February 9, 2022, for injections. (Tr. 1516.) Her condition was unchanged. (*Id.*)

Ms. Span consulted with Dr. Ramella on April 22, 2022. (Tr. 1719.) Ms. Span complained of headaches and pain in her heels. (*Id.*) Dr. Ramella ordered an x-ray of her foot. (*Id.*)

Ms. Span consulted with Dr. Ignat on May 10, 2022. (Tr. 1512.) Her condition was unchanged. (*Id.*)

Ms. Span consulted with Dr. Ramella on August 4, 2022. (Tr. 1722.) Dr. Ramella listed fibromyalgia on the list of assessed medical problems, noting that it was "stable." (*Id.*)

Ms. Span consulted with Dr. Ignat on August 9, 2022. (Tr. 1507.) Dr. Ignat identified fibromyalgia among Ms. Span's assessed medical problems. (*Id.*)

Ms. Span consulted with Dr. Ignat on November 16, 2022. (Tr. 1503.) Dr. Ignat identified fibromyalgia among Ms. Span's assessed medical problems and ordered an x-ray regarding the condition. (*Id.*; *see also* Tr. 1733 (the results showed no abnormalities).)

Ms. Span consulted with Dr. Ramella on January 13, 2023. (Tr. 1729.) Her condition was unchanged. (*Id.*)

Ms. Span consulted with Dr. Ignat on February 15, 2023. (Tr. 1499.) Dr. Ignat listed fibromyalgia among Ms. Span's assessed medical problems. (*Id.*) Dr. Ignat noted that Ms. Span complained of pain "all over" at the appointment. (*Id.*)

Ms. Span consulted with Dr. Ramella on May 16, 2023. (Tr. 1764.) Her condition was largely unchanged. (*Id.*)

Ms. Span consulted with Dr. Ignat on May 17, 2023, for injections. (Tr. 1766.) Dr. Ignat noted fibromyalgia among the list of Ms. Span's medical conditions. (*Id.*)

### b. *Mental Health*

On January 14, 2015, Ms. Span consulted with Dr. Thomas Evans, Ph.D., for purposes of a psychological evaluation in connection with her previous disability claim. (Tr. 1122.) Ms. Span was late to the appointment. (*Id.*) Dr. Evans opined that Ms. Span has persistent depressive disorder, moderate. (Tr. 1125.) But he described only minimal limitations stemming from the disorder, based primarily on Ms. Span's report that in the past there were times that she was too depressed to go to work. (*See* Tr. 1125–26.)

Ms. Span underwent a psychiatric assessment with Laura Petitti on September 1, 2016. (Tr. 429.) Petitti diagnosed Ms. Span with a major depressive disorder and an unspecified anxiety disorder. (Tr. 431–32.)

Ms. Span has consulted with nurse practitioners and other mental-health professionals over the years. (Tr. 412–413, 417, 425, 433, 437, 443, 445–46, 508, 512, 516, 520, 569, 572, 576, 580, 583, 586, 589, 592, 621, 624, 627, 631, 1164, 1328, 1431, 1433–35, 1439, 1447–48, 1752, 1754, 1756, 1772, 1785, 1811.) With a few exceptions, the Court finds that it need not recite the details of these appointments in deciding this administrative appeal.

The Court notes that Ms. Span told a pharmacist in 2016 that she had fibromyalgia. (Tr. 1756.)

Ms. Span consulted with psychiatrist Dr. Zohaib Abbasi on March 7, 2018. (Tr. 421.) Dr. Abbasi noted that Ms. Span was doing better since the last visit, had been going to church, and had signed up for dancing classes. (Tr. 422.)

Ms. Span was evaluated by Dr. Charles Misja, Ph.D., on May 18, 2018, for purposes of her disability application. (Tr. 394.) Dr. Misja wrote that Ms. Span was "in some degree of both physical and mental distress" during the interview, noting that she repositioned herself numerous times on the couch. (Tr. 398.) Dr. Misja opined that it did not appear that Ms. Span was exaggerating her symptoms. (*Id.*) Dr. Misja diagnosed Ms. Span with bipolar disorder I and generalized anxiety disorder. (Tr. 399.)

Ms. Span had several "no show" appointments with counselors between 2018 and 2020. (Tr. 1279–80.)

Ms. Span consulted with certified nurse practitioner Morgan Wiggins on December 9, 2019. (Tr. 1441–42.) Ms. Wiggins noted a fibromyalgia diagnosis in Ms. Span's medical history. (Tr. 1444.)

Ms. Span consulted with certified nurse practitioner Jennifer Mlady on May 15, 2020. (Tr. 1428.) Ms. Span reported severe joint pain. (Tr. 1429.)

Counseling records note a diagnosis of fibromyalgia in Ms. Span's medical history. (Tr. 1427.)

Ms. Span consulted with Dr. Syed on September 25, 2020. (Tr. 1202.) Dr. Syed's notes identify fibromyalgia among Ms. Span's medical history. (*Id.*) He noted that Ms. Span complained of "7/10 pain" "in whole body" "even with meds." (Tr. 1204.)

Ms. Span consulted with Dr. Syed in a virtual appointment on January 13, 2021. (Tr. 1213.) Dr. Syed noted that Ms. Span was taking venlafaxine HCI (Effexor), Lyrica, and tramadol to treat fibromyalgia. (*Id.*)

Ms. Span consulted with Dr. Syed in a virtual appointment on February 25, 2021. (Tr. 1215.) Dr. Syed again noted that Ms. Span was taking tramadol to treat fibromyalgia. (Tr. 1218.)

Ms. Span consulted with Dr. Syed on May 28, 2021. (Tr. 1219.) Dr. Syed again noted the fibromyalgia treatment. (Tr. 1223.)

Ms. Span consulted with Dr. Syed in a virtual appointment on August 30, 2021. (Tr. 1306.) Ms. Span reported chronic pain in her back, hips, hands "and every where in joints." (*Id.*) She complained that she could not comb her hair "as can not lift her arms for long." (*Id.*) Dr. Syed again noted the fibromyalgia treatment. (Tr. 1309.)

Ms. Span consulted with Dr. Syed in a telephone appointment on October 13, 2021. (Tr. 1312.) Dr. Syed noted the fibromyalgia treatment. (Tr. 1315.) Ms. Span reported that she had secured employment at a pharmacy but did not start "because her attorney asked her not to do that at this time." (Tr. 1328.)

Ms. Span consulted with Dr. Syed at a virtual appointment on January 19, 2022. (Tr. 1154.) Dr. Syed noted that Ms. Span was sitting comfortably in a chair during the appointment. (Tr. 1155.) Dr. Syed continued her on the same medication but noted that Ms. Span reported feeling tired and fatigued. (Tr. 1156.)

Ms. Span was voluntarily admitted to a hospital outpatient program for mental-health treatment between December 22 and December 31, 2022. (*E.g.*, Tr. 1575.) Hospital records recorded a diagnosis of fibromyalgia. (Tr. 1559.)

Ms. Span reported an improvement in back symptoms and an improvement in mental-health systems on January 27, 2023, but reported that she did not have access to a car. (Tr. 1599.) She expected to have access to a car in several weeks. (*Id.*)

On March 2, 2023, Ms. Span consulted with Dr. Charles Luther via a telehealth appointment. (Tr. 1799.) Ms. Span reported that she had been crocheting for up to 30 minutes, coloring, and reading. (*Id.*)

Ms. Span consulted with Dr. Luther again on April 20, 2023, in a telehealth appointment. (Tr. 1804.) Ms. Span reported that she was looking for part-time work and working to secure a car. (*Id.*)

## IV.    DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ determined that Ms. Span has not engaged in substantial gainful activity since August 26, 2016. (Tr. 693.)

The ALJ further determined that Ms. Span has the following severe impairments: (1) degenerative disc disease and disorders of the skeletal spine, (2) depressive and bipolar disorders, (3) inflammatory arthritis, (4) anxiety disorder, (5) attention-deficit/hyperactivity disorder, and (6) obsessive-compulsive disorders. (Tr. 693.)

The ALJ found that Ms. Span's alleged fibromyalgia was not a medically determinable impairment, reasoning that "no acceptable medical source" diagnosed the condition and stating that the record did not contain evidence of a history of widespread pain in all quadrants of the body

and axial skeletal pain, nor evidence that other disorders that could cause the symptoms or signs had been excluded. (Tr. 694.)

In coming to this conclusion, the ALJ noted that Dr. Kavlich's medical source statement was unpersuasive "because it relied heavily on the claimant's subjective reports" and was inconsistent with examinations that showed normal strength, range of motion, sensation, and reflexes. (Tr. 705.)

The ALJ noted that the ALJ considered all of Ms. Span's conditions—both severe and non-severe—when assessing Ms. Span's residual functional capacity. (*Id.*) After doing so, the ALJ concluded that none of Ms. Span's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Ms. Span had the residual functional capacity to:

> [P]erform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except claimant can perform frequent bilateral handling/fingering. Claimant cannot work at a production rate pace. Claimant can have frequent and superficial interactions with supervisors, co-workers, and the public. Superficial is defined as no arbitration, mediation, negotiation, confrontation or being responsible for the safety or supervision of others.

(Tr. 696.)

The ALJ then determined that Ms. Span could perform her past relevant work as a receptionist. (Tr. 706.) In coming to this conclusion, the ALJ found that she had to adopt the findings from the previous denial that Ms. Span performed past relevant work as a receptionist, which was "semi-skilled, SVP 4, generally and actually performed at the sedentary exertional level." (*Id.*) The ALJ concluded that these findings had to be adopted pursuant to *Dennard v. Sec'y of Health and Human Servs.*, 907 F.2d 598 (6th Cir. 1990) and the Social Security Administration's Acquiescence Ruling 98-3. *See* SSAR 98-3(6), 1998 WL 283901 (June 1, 1998).

22

The ALJ also determined that Ms. Span could perform other light, unskilled jobs that exist in significant numbers in the national economy, such as work as a "cleaner," "marker," or "cleaner polisher." (Tr. 707–08.)

Accordingly, the ALJ determined that Ms. Span was not disabled. (Tr. 708.)

## V.    LAW AND ANALYSIS

### A.    Standard of Review

Whether reviewing a decision to deny SSI benefits (undertaking the review authorized by 42 U.S.C. § 1383(c)(3)) or a decision to deny disability insurance benefits (reviewing under 42 U.S.C. § 405(g)), the Court uses the same standard of review. *See* 42 U.S.C. § 1383(c)(3) (final determinations under 42 U.S.C. § 1383 "shall be subject to judicial review as provided in [§] 405(g) . . . to the same extent as . . . final determinations under [§] 405 . . . .").

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a

reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983).

In addition to considering whether the Commission's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA failed to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

## B.     Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the

national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RCF to perform work in the national economy. *Id.*

### C.    Analysis

Ms. Span contends that the ALJ erred at step two of the sequential-evaluation process when the ALJ found that Ms. Span's fibromyalgia was not a severe impairment. She further contends that the ALJ improperly concluded that Dr. Ignat's May 16, 2019, medical opinion was not consistent with or supported by the evidence in the record. She next argues that the ALJ erred in the application of res judicata to the current application. Finally, she argues that that the ALJ's determination of Ms. Span's RFC was not supported by sufficient evidence.

The Commissioner responds that (1) the ALJ reasonably determined that Ms. Span's fibromyalgia was not a severe impairment, (2) the ALJ reasonably found Dr. Ignat's opinion unpersuasive because it was inconsistent with the findings of the state medical consultants, (3) the RFC was supported by substantial evidence, and (4) Ms. Span is capable of working.

The Court agrees that the ALJ erred at Step Two when the ALJ failed to adequately consider whether fibromyalgia is a medically determinable condition. Finding it appropriate to vacate the Commissioner's decision and remand on this ground, the Court does not reach the remaining assignments of error.

Application of the usual disability analysis is challenging when it comes to fibromyalgia because "unlike medical conditions that can be confirmed by objective testing, fibromyalgia

patients present no objectively alarming signs." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007); *see also Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 989, 990 (N.D. Ohio 2003). In these cases, medical evidence confirming the severity of a claimant's alleged pain "almost never exists." *Anderson v. Comm'r of Soc. Sec.*, No. 1:18CV0070, 2018 WL 7199514, at *8 (N.D. Ohio Dec. 21, 2018) (citing *Davila v. Comm'r of Soc. Sec.*, 993 F. Supp. 2d 737, 755 (N.D. Ohio 2014); *Swain*, 297 F. Supp. 2d at 990), *report and recommendation adopted*, 2019 WL 415244 (N.D. Ohio Feb. 1, 2019)).

Social Security Ruling ("SSR") 12-2p describes the criteria for evaluating whether a person has a medically determinable impairment of fibromyalgia. *Luukkonen v. Comm'r of Soc. Sec.*, 635 F. App'x 393, 398-99 (6th Cir. 2016). Under SSR 12-2p, a person has fibromyalgia if: (1) there is a history of widespread pain, in all quadrants of the body, that has persisted for at least 3 months (the pain may fluctuate in intensity and may not always be present); (2) at least 11 of 18 possible positive tender points are found on physical examination; and (3) there is evidence that other disorders were excluded as possible causes of the pain. SSR 12-2p, 2012 WL 3104869, at *2–3. The claimant must satisfy all three of these elements to have a medically determinable impairment of fibromyalgia. *Id.* at *2.

Alternatively, a claimant who meets all of the following elements can be found to have fibromyalgia: (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms, signs,[5] or co-occurring conditions,[6] especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or

---

[5] Symptoms and signs include, among others, muscle pain, fatigue or tiredness, muscle weakness, headache, pain or in the abdomen, numbness or tingling, dizziness, insomnia, depression, blurred vision, and rash. SSR 12-2p, 2012 WL 3104869, at *3 fn.9.

[6] Co-occurring conditions include, among others, depression, chronic fatigue syndrome, migraine, or restless leg syndrome. SSR 12-2p, 2012 WL 3104869, at *3 fn.10.

26

irritable bowel syndrome; and (3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded. SSR 12-2p, 2012 WL 3104869, at *3.

Here, the ALJ found that "no acceptable medical source diagnosed the claimant with fibromyalgia. (Tr. 694.) The ALJ further briefly reasoned, citing SSR 12-2p, that the record "did not include evidence of the requisite positive tender points" or "evidence that other disorders were excluded." (*Id.*) Stating that "[n]o medical source identified trigger points and/or ruled out other conditions that could cause her symptoms," the ALJ concluded that fibromyalgia was not a medically determinable impairment. (*Id.*)

Contrary to these findings, the medical records reflect that Ms. Span was diagnosed with and treated for fibromyalgia, both by primary-care physicians and a rheumatologist. (*See, e.g.*, Tr. 366 (Dr. Kavlich in 2017); Tr. 564 (Dr. Ramella in March 2019); Tr. 1364 (Dr. Ramella in August 2021); Tr. 1722 (Dr. Ramella in August 2022); Tr. 1507 (Dr. Ignat in August 2022); Tr. 1503 (Dr. Ignat in November 2022); Tr. 1499 (Dr. Ignat in February 2023).) It is true that the condition was, somewhat inexplicably, not always included in all the medical records. *Compare* Tr. 1764 (fibromyalgia not listed on May 16, 2023) *with* Tr. 1766 (listing the condition at an appointment on the very next day). But the diagnosis is reflected in medical and counseling records going back to 2017. (*See, e.g.*, Tr. 366, 564, 1189, 1218, 1364, 1378, 1427, 1444, 1499, 1503, 1507, 1722.)

Moreover, while the ALJ referred generally to the 2010 ACR Preliminary Diagnostic Criteria, the ALJ did not sufficiently consider the medical evidence in light of those criteria.

Dr. Kavlich's 2017 diagnosis—identified in his medical-source statement—was made after a battery of tests came back normal, including an MRI of Ms. Span's spine (Tr. 1111),

rheumatological blood tests (including AVISE and Vectra) (Tr. 362), and nerve-conduction-velocity tests on the upper extremities (Tr. 360).

Medical records between that diagnosis and the ALJ's decision reflect a history of widespread pain, axial skeletal pain, and fatigue that has persisted for years. (*See, e.g.*, Tr. 537, 540, 544, 564, 638, 683, 681, 1178, 1194, 1499.) Medical records identify that Ms. Span has complained of pain and has been found to have tenderness in several tender points, including at the gluteal, greater trochanter, and knee points. She has complained of and been treated for persistent headache, numbness, and muscle weakness.

Medical records also reveal that Ms. Span has undergone both imaging and laboratory tests over the years, including complete blood counts, anti-nuclear antibody testing, thyroid consultations, and rheumatological tests.

Finally, mental-health records reflect diagnoses of depression and anxiety disorders and otherwise corroborate the medical symptomology in several ways. Dr. Misja, for example, noted that it appeared that Ms. Span was physically uncomfortable during an appointment and did not seem to be exaggerating her symptoms. (Tr. 398.) Ms. Span also repeatedly brought up her severe pain throughout her body and fatigue when discussing her mental challenges with professionals. (*See, e.g.*, Tr. 1156, 1204, 1306, 1428.)

After a careful review, the Court is convinced that the record contains sufficient evidence of a documented history of widespread pain, repeated manifestations of fibromyalgia symptoms, signs, and co-occurring conditions, and evidence that other disorders were excluded that this matter should be remanded for the ALJ to further consider and explain its reasoning whether the 1990 ACR Criteria for the Classification of Fibromyalgia elements are met and to consider and explain in detail how the medical evidence comports with the 2010 ACR Preliminary Diagnostic Criteria.

Because the Court finds its appropriate to remand based on this early step of the sequential-evaluation process, the Court need not reach the remaining assignments of error, which are directed to the ALJ's consideration of the residual-functional capacity and the remaining steps of the evaluation.

## VI.    CONCLUSION

Based on the foregoing, the Court VACATES the Commissioner's decision denying Ms. Span's application for SSI benefits and REMANDS for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated:  October 30, 2024                    */s Jennifer Dowdell Armstrong*
                                             JENNIFER DOWDELL ARMSTRONG
                                             UNITED STATES MAGISTRATE JUDGE